### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

HILLCREST CENTER, LLC,

                      Plaintiff,

v.

TON REAL ESTATE INVESTMENTS III, LLC,
DANIEL OLSWANG, and JOHN THOMAS,

                      Defendants.

Civil No. 20-1158 (JRT/HB)

**MEMORANDUM OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

---

Lehoan T. Pham and William L. Moran, **HKM LAW GROUP**, 30 East Seventh Street, Suite 3200, Saint Paul, MN 55101, for plaintiff.

Erik Rootes, Julia J. Nierengarten, and Karl J. Yeager, **MEAGHER & GEER PLLP,** 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for defendants.

Plaintiff Hillcrest Center, LLC ("Hillcrest") initiated an action against Ton Real Estate Investments III, LLC ("TREI"), Daniel Olswang, and John Thomas (collectively, "Defendants"), alleging that TREI had breached the parties' purchase agreement regarding a Saint Paul shopping center (the "Agreement") and that Olswang and Thomas had breached a promissory note (the "Note") that came due after TREI failed to close on the property under the Agreement. After Defendants filed an Answer and limited fact discovery concluded, the parties filed cross-motions for summary judgment. Because no reasonable jury could return a verdict for Defendants, as the record indisputably shows that TREI breached the Agreement and that Olswang and Thomas breached the Note, the

Court will deny Defendants' Motion for Summary Judgment and grant Plaintiff's Motion

for Summary Judgment.

**BACKGROUND**

I.      **FACTUAL BACKGROUND**

        A.      **The Initial Agreement**

        On September 24, 2019, Hillcrest entered into the Agreement with TREI, whereby

TREI agreed to purchase the shopping center from Hillcrest for $9,250,000 and make an

initial deposit of $50,000.  (Decl. Karl J. Yeager ("Yeager Decl.") ¶ 3, Ex. A ("Agreement")

at 2, 11, Feb. 19, 2021, Docket No. 31-1.)  Three sets of provisions in the Agreement are

of relevance here: (1) those regarding the Due Diligence Period and related conditions

precedent; (2) those regarding the Actual Closing Date and related conditions precedent;

and (3) those defining the remedial steps to follow if a party failed to perform its

obligations.

                1.      **Due Diligence Period**

        The Agreement obligated Hillcrest to provide "the Due Diligence Materials and all

documents, information and other materials comprising, evidencing or creating the

Property or any portion thereof" on or before the "Delivery Date." (Agreement at 4.)  As

such, Hillcrest had to provide, among other things, "all surveys . . . all certificates of

occupancy, licenses, permits, authorizations, and approvals required by any Legal

Requirement or issued by any Governmental Authority . . . [and] all existing owner's title

-2-

insurance policy, documents of title and survey" by October 4, 2019.  (*Id.* at 13 (defining

"Due Diligence Materials"); *id.* at 12, 14 (defining "Delivery Date" and "Effective Date").)

Hillcrest provided a link to access some Due Diligence Materials, namely leases, on

September 30, 2019.  (Yeager Decl. ¶ 5, Sealed Ex. C at 2, Feb. 19, 2021, Docket No. 32;

Yeager Decl. ¶ 28, Ex. Z ("Pl.'s Responses") at 87, Feb. 19, 2021, Docket No. 31-1.)

However, Hillcrest did not provide a survey, certificates of occupancy, or a title insurance

policy to TREI by the Delivery Date, or ever.[1]  (Pl.'s Responses at 87–88.)

Following the Delivery Date, the Agreement specified that the Due Diligence period

would run for 45 days, then end on the Contingency Date.  (Agreement at 2; *id.* at 12

(defining "Contingency Date").)  During this period, TREI's obligations were conditioned

under section 3(a) of the Agreement, as relevant here, as follows:

> It is a condition precedent to the performance by Buyer of its
> obligations hereunder that the following condition precedent
> be satisfied or expressly waived in writing by Buyer on or
> before the Contingency Date: (i) Buyer is satisfied with the
> results of the inspections, document reviews and studies as
> described in this Agreement[.]

(*Id.* at 3.)  In the event this condition precedent was not satisfied, "as evidenced

conclusively in a written certification from Buyer, or waived in writing by Buyer on or

before the Contingency Date, and Buyer elects in writing to terminate this Agreement,"

---

[1] Hillcrest maintains that, while it did not have a survey in its possession, it did turn over the closest equivalent.  (Pl.'s Responses at 87; Yeager Decl. ¶ 29, Ex. AA at 2–3, Feb. 19, 2021, Docket No. 37.)  In the case of the title insurance policy, Hillcrest provided a title commitment instead. (Yeager Decl. ¶ 30, Ex. AB at 2, Feb. 19, 2021, Docket No. 38.)

then the Agreement would terminate pursuant to section 3(c), "provided Buyer notifies Seller of such election on or before the Contingency Date." (*Id.*)

TREI never elected in writing to terminate the Agreement pursuant to section 3(a) or 3(c) on or before the Contingency Date, nor did it ever provide notice of any such election by then.[2]  (Decl. Alex L. Rubenstein ("Rubenstein Decl.") ¶ 24, Ex. 23 ("Defs.' Responses") at 148–49, Mar. 12, 2021, Docket No. 43-1.)

### 2. Actual Closing Date

After the Contingency Date, TREI's obligations were further conditioned under section 3(b) of the Agreement, which states, as relevant here, that: "the following condition[] precedent be satisfied or expressly waived in writing by Buyer on or before the Actual Closing Date . . . (ii) Seller fulfill all of its obligations under this Agreement within the time and in the manner herein provided[.]"  (Agreement at 3.)  If this condition precedent was not satisfied, "as evidenced conclusively in a written certification from Buyer, or waived in writing by Buyer on or before the Actual Closing Date, and Buyer elects in writing to terminate this Agreement," then the Agreement would terminate pursuant to section 3(d), "provided Buyer notifies Seller of such election on or before the Actual Closing Date." (*Id.* at 3–4.)  The "Actual Closing Date" is defined as the actual date on

---

[2] While someone wrote November 11, 2019 as the Contingency Date on the Agreement, (Agreement at 2), and both parties seem to accept this date as close enough in their briefing, by the Court's calculation, the Contingency Date fell on November 18, 2019, 55 days after TREI signed the Agreement (10 days after TREI's signing (the Delivery Date), plus 45 days).  However, the discrepancy of one week is unimportant, as TREI did not provide notice or elect in writing to terminate the Agreement before November 11 or 18.

which the parties manage to fulfill their respective closing obligations and consummate the transaction.[3] (*Id.* at 12.)

TREI never elected in writing to terminate the Agreement pursuant to section 3(b) or 3(d), nor did it ever provide notice of any such election, until Hillcrest initiated the current action. (Defs.' Responses at 148–49.) Then, in its Answer to the Complaint, TREI asserted that it was providing written notice that Hillcrest failed to fulfill its due diligence obligations. (Decl. Daniel Olswang ¶¶ 3–4, Feb. 19, 2021, Docket No. 30; Answer at 2, 6, June 26, 2020, Docket No. 10.)

### 3.    Remedies

Pursuant to section 12 of the Agreement, if a party failed to perform its obligations, then the non-defaulting party was required to provide written notice to the defaulting party specifying the default. (Agreement at 7.) The defaulting party then had 10 days to cure the default before the non-defaulting party could assert its right to a remedy. (*Id.*)

### B.    First Amendment to the Agreement

Hillcrest was ready to close on December 5, 2019, (Yeager Decl. ¶ 7, Ex. E at 30, Feb. 19, 2021, Docket No. 31-1), but TREI apparently was not, as the parties amended the Agreement to move the Closing Date to December 26 instead. (Yeager Decl. ¶ 8, Ex. F

---

[3] The Agreement also references a Closing Date, which was to occur 15 days after the Due Diligence period had expired or as otherwise agreed. (Agreement at 2, 12.) However, only the Actual Closing Date is of relevance with respect to the condition precedent described in section 3(b). Of course, as described below, the Actual Closing Date never arose, as the parties never closed.

("1st Amendment") at 32, Feb. 19, 2021, Docket No. 31-1.)  TREI also agreed to deposit an additional $50,000, thus bringing the total closing amount to $100,000, a sum which would be immediately released to Hillcrest if TREI failed to close again.  (1st Amendment at 32.)

As the new Closing Date approached, the parties engaged in an active back-and-forth process to get the necessary documentation in order.  For example, Hillcrest sent TREI an updated rent roll and income expense report on December 13, 2019.  (Yeager Decl. ¶ 31, Sealed Ex. AC at 2, Feb. 19, 2021, Docket No. 39.)  Then, on December 20, Hillcrest worked to have three lease amendments signed and acquire some missing closing documents, namely estoppels and SNDA agreements.[4]  (Rubenstein Decl. ¶ 25, Sealed Ex. 24 at 8–13, Mar. 12, 2021, Docket No. 44; *see also* Agreement at 6–7 (listing documents to be delivered at closing).)  Regarding SNDA agreements, TREI asked its underwriter if having them signed and ready could be a post-closing condition instead, which the underwriter stated would be possible.  (Rubenstein Decl. ¶ 25, Sealed Ex. 24 at 8.)

### C.    Second Amendment to the Agreement

However, instead of closing under the First Amendment, the parties again amended the Agreement to move the Closing Date to January 22, 2020.  (Yeager Decl. ¶ 14, Ex. L ("2nd Amendment") at 42, Feb. 19, 2021, Docket No. 31-1.)  Additionally, the

---

[4] "SNDA" stands for subordination, non-disturbance, and attornment.

$100,000 deposit was released to Hillcrest, and the purchase price was raised to $9,350,000.  (2nd Amendment at 42.)

The Second Amendment stated that the Agreement remained in full force and effect in accordance with its terms.  (*Id.*)  However, it also contained a new provision, entitled "Failure to Close," which stated that if the parties did not close on or before January 22, 2020, "this Agreement shall terminate and Seller shall retain the [$100,000] with neither Seller nor Buyer having any further obligation under the Agreement."  (*Id.*)

### D.    Third Amendment to the Agreement and the Note

Although TREI sent a draft closing statement to Hillcrest on January 20, 2020, TREI was unable to close on January 22.  (Rubenstein Decl. ¶ 6, Ex. 5 at 34–37, Mar. 12, 2021, Docket No. 43–1; Yeager Decl. ¶ 18, Ex. P at 56, Feb. 19, 2021, Docket No. 31-1.)  As a result, the parties executed a Third Amendment to move the Closing Date to March 13, 2020.  (Yeager Decl. ¶ 19, Ex. Q ("3rd Amendment") at 61, Feb. 19, 2021, Docket No. 31-1.)  The purchase price was kept at $9,350,000, less the deposit of $100,000, with $9,250,000 due at closing.  (3rd Amendment at 61.)

As before, the Agreement remained in full force and effect in accordance with its terms.  (*Id.*)  However, section 12 of the Agreement was modified to allow Hillcrest to commence an action for specific performance if TREI was in breach,[5] and to obligate

---

[5] During discussions leading up to the Third Amendment, Hillcrest had made it known that it required a specific performance clause to be added.  (Rubenstein Decl. ¶ 8, Ex. 7 at 43, Mar. 12, 2021, Docket No. 43-1.)

Olswang and Thomas to pay $250,000, jointly and severally, if TREI failed to purchase the property by March 13, 2020.  (*Id.*)

Olswang and Thomas's joint obligation was secured by the Note.  (Yeager Decl. ¶ 21, Ex. S ("Note") at 67, Feb. 19, 2021, Docket No. 31-1.)  If TREI failed to close on March 13, the Note would be immediately due and payable on demand.  (Note at 67.) Additionally, five days after any such demand, interest would begin accruing at a rate of 12 percent per annum.  (*Id.*)  The Note also specified that its remedies would be cumulative and concurrent with those provided under the Agreement.  (*Id.*)  Finally, Olswang and Thomas agreed to pay any reasonable attorney fees paid by Hillcrest in enforcing the Note.  (*Id.*)

The parties apparently agreed to move the Closing Date to March 19, 2020 instead of March 13; but, on March 12, TREI stated that it would not be able to close.[6] (Yeager Decl. ¶ 22, Ex. T at 72, Feb. 19, 2021, Docket No. 31-1.)  On April 9, 2020, Hillcrest demanded payment from Olswang and Thomas under the Note.  (Yeager Decl. ¶ 22, Ex. T at 74; Yeager Decl. ¶ 23, Ex. U at 76, Feb. 19, 2021, Docket No. 31-1.)

### E.   Proposed Contract for Deed

After the last failure to close, Hillcrest sent TREI a draft termination of the Agreement and a draft contract for deed to be used in place of the Agreement.

---

[6] TREI later admitted that it was never able to secure the necessary financing to purchase the property under the Agreement.  (Defs' Responses at 148; Rubenstein Decl. ¶ 26, Ex. 25 ("Defs.' Answers") at 8, Mar. 12, 2021, Docket No. 43-3.)

(Rubenstein Decl. ¶¶ 15, 18, Ex. 14 at 81–83 & Ex. 17 at 103, Mar. 12, 2021, Docket No. 43-1.)  TREI added a provision to the draft, declaring the Note to be null and void upon execution of the contract for deed and signed the document.  (Yeager Decl. ¶ 26, Ex. X at 12, 14, Feb. 19, 2021, Docket No. 36.)

However, Hillcrest would not execute on its end until TREI wired the first portion of the purchase money, which never happened.[7]  (Rubenstein Decl. ¶¶ 20–21, Ex. 19 at 138 & Ex. 20 at 140, Mar. 12, 2021, Docket No. 43-1.)  On May 12, 2020, Hillcrest gave notice that it was going to commence an action for specific performance.  (Rubenstein Decl. ¶ 23, Ex. 22 at 144, Mar. 12, 2021, Docket No. 43-1.)

## II.     PROCEDURAL BACKGROUND

Hillcrest initiated this action on May 13, 2020, alleging breach of contract by TREI, Olswang, and Thomas, and asking for specific performance under the Agreement and Amendments.  (Compl. ¶¶ 21–34, May 13, 2020, Docket No. 1.)  Defendants filed an Answer, asserting that the Agreement, Amendments, and Note are unenforceable or, in the alternative, that Hillcrest failed to fulfill its due diligence obligations and, thus, Defendants have no obligation to perform.  (Answer at 5–7.)  After limited discovery, (*see generally* Pretrial Scheduling Order, Sept. 17, 2020, Docket No. 20), the parties filed cross-

---

[7] Additionally, as of May 6, 2020, TREI was unable to secure enough funding to pay the initial $2,500,000 contemplated under the contract for deed.  (Defs.' Answers at 9.)

motions for summary judgment.  (Defs.' Mot. Summ. J., Feb. 19, 2021, Docket No. 27; Pl's

Mot. Summ. J., Mar. 12, 2021, Docket No. 46.)

## DISCUSSION

### I.  STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material

fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and

a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A court considering a motion for summary judgment must view the facts in the

light most favorable to the non-moving party and give that party the benefit of all

reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party may not rest on mere

allegations or denials but must show through the presentation of admissible evidence

that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (citing

Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."  *Id.* at 252.  At the summary judgment stage, the Court

will not make credibility determinations or weigh the evidence before it.  *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## II.   ANALYSIS

The Court considers the record to determine whether there remains a genuine issue of material fact as to whether TREI breached the Agreement and Amendments.[8] "A breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of the contract." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014).  The elements of a breach of contract claim are: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  The parties contest the first two elements, which the Court will consider in reverse order.

### A.   Conditions Precedent

Defendants argue that, because Hillcrest never provided all the Due Diligence Materials, TREI was never obligated to close on the property and Olswang and Thomas were never obligated to satisfy the Note.  Hillcrest counters that TREI never provided written notice of any dissatisfaction with Hillcrest's due diligence performance and that TREI waived the right to seek refuge under section 3's conditions precedent by ignoring Hillcrest's failure to fully perform; thus, Defendants were obligated to perform.

---

[8] Whether Olswang and Thomas breached the Note turns entirely on whether TREI breached the Agreement and Amendments.

The parties disagree about which conditions precedent are of relevance.   Hillcrest claims that only those regarding the Contingency Date are—section 3(a) and (c)—and Defendants argue that only those regarding the Actual Closing Date are—section 3(b) and (d).  The Court will consider both sets of conditions precedent.

### 1.    Contingency Date

The Agreement obligated Hillcrest, on or before the Delivery Date, to provide TREI with all Due Diligence Materials.  As such, Hillcrest was obligated to provide all Due Diligence Materials by October 4, 2019 or otherwise be in default.  Regarding the Contingency Date—when the due diligence period would expire—this would occur 45 days after the Delivery Date.  As such, TREI could have decided to terminate the Agreement pursuant to section 3(c) on or before November 18, 2019[9] if it was dissatisfied with Hillcrest's due diligence performance.

Hillcrest provided a link to access some leases on September 30, 2019, which occurred before the Delivery Date.  After the Delivery Date, Hillcrest continued to update materials after deficiencies or gaps were identified by TREI's underwriter in December, updates that were contemplated by the due diligence delivery provision.  However, at least three types of due diligence materials—a survey, certificates of occupancy, and a title insurance policy—were never provided to TREI.  Thus, Hillcrest failed to perform some of its obligations with respect to both the Delivery Date and the Contingency Date

---

[9]*See supra* note 2.

(that is, leading up to and during the due diligence period).  As such, TREI had two options

if it desired to get out of the deal based on Hillcrest's failure to perform then: it could

either (1) exercise its rights under the remedies provision of the Agreement, section 12,

after the Delivery Date had passed; or (2) provide written notice of its intent to terminate

the Agreement under section 3(c) on or before the Contingency Date.

### a.      Section 12

Under section 12, TREI could have asserted its right to have the deposited money

returned and then walk away from the deal, but only if it provided written notice

specifying Hillcrest's due diligence default and only if Hillcrest failed to cure the default

within ten days after receiving such notice.  However, TREI never voiced discontent when

Hillcrest supplied a survey substitute or a title commitment instead of the title policy, and

never said anything about needing occupancy certificates.  Instead, TREI continued to

recognize the Agreement as binding while working alongside Hillcrest to close the deal,

even suggesting that some documents be submitted after closing.  Moreover, TREI agreed

to amend the Agreement and further obligate itself three times over the next four

months.  As such, TREI has waived the right to assert any claim of breach by Hillcrest in

regard to the Due Diligence Materials.  *Creative Commc'ns Consultants, Inc. v. Gaylord*,

403 N.W.2d 654, 657 (Minn. Ct. App. 1987) ("A party's continued recognition of a contract

as binding after the other party's alleged breach acts as a waiver of that breach.").

Furthermore, because TREI never provided such written notice to Hillcrest specifying Hillcrest's failure to provide all Due Diligence Materials by the Delivery Date, it is also barred from asserting that Hillcrest breached the Agreement in regard to this failure. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 365–66 (Minn. 2009) ("[P]arties to a contract may expressly agree that written notice of breach is a condition precedent to bringing a breach of contract claim and that the failure to give written notice bars a subsequent claim.").  In sum, TREI has no legal rights to assert pursuant to section 12 of the Agreement.

### b.    Section 3(a) and (c)

"A condition precedent is 'any fact except mere lapse of time which must exist or occur before a duty of immediate performance by the promisor can arise.'" *enXco Dev. Corp. v. N. States Power Co.*, No. 11-1171, 2013 WL 1364242, at *5 (D. Minn. Apr. 4, 2013), *aff'd*, 758 F.3d 940 (8th Cir. 2014) (quoting *Carl Bolander & Sons, Inc. v. United Stockyards Corp.,* 215 N.W.2d 473, 476 (Minn. 1974)).  Further, "if the event required by the condition does not occur, there can be no breach of contract." *451 Corp. v. Pension Sys. for Policemen & Firemen,* 310 N.W.2d 922, 924 (Minn. 1981).

Here, to trigger the protections of the Contingency Date condition precedent, TREI was obligated to take defined steps.  As described in section 3(a), if TREI was not satisfied with the results of inspections, document reviews and studies during the due diligence period—which would include Due Diligence Materials, given that the Contingency Date is

defined in relation to the Delivery Date—then, under section 3(c), TREI had to certify its dissatisfaction in writing on or before November 18, 2019 to terminate the Agreement, provided written notice of termination was also provided by this date.  Yet, it is undisputed that TREI did not commit to writing any such dissatisfaction or decision not to proceed with the purchase of the property on or before November 18, 2019.  In fact, it never did until after Hillcrest initiated the instant action.

Additionally, a condition "may be excused by acceptance of performance in spite of the non-occurrence of the condition."  Restatement (Second) of Contracts § 225 (1981). As mentioned above, TREI did precisely this: it accepted Hillcrest's performance and worked alongside Hillcrest to close the deal after the Contingency Date had passed, and TREI never once mentioned a concern regarding the missing survey, title insurance policy, or occupancy certificates until Hillcrest filed suit.  Thus, TREI is barred from asserting now that it could have terminated the Agreement pursuant to section 3(c).   *Wolff v. McCrossan*, 210 N.W.2d 41, 43 (Minn. 1973) ("[W]here the course of conduct of a party entitled to the performance of certain terms or conditions of a contract has led the other party to believe that such performance will not be required until it has become too late to perform, the person who has so conducted himself is barred from asserting the right he had.").

In sum, TREI cannot seek refuge in the Contingency Date condition precedent offers to evade its obligation to have closed on the property under the Agreement and Amendments.

### 2.    Actual Closing Date

After the Contingency Date had passed, another condition precedent protected TREI up until the Actual Closing Date.  Under section 3(b), if TREI was not satisfied that Hillcrest had fulfilled all its obligations under the Agreement in the time and manner provided, then TREI could elect in writing to terminate the Agreement under section 3(d), so long as it certified its dissatisfaction in writing and provided written notice of its intent to terminate on or before the Actual Closing Date.

Of course, there never was, nor will there be, an Actual Closing Date—that possibility has been foreclosed by the fact that TREI was never able to close on the deal and because Hillcrest then initiated the instant action.  Given that such a date never occurred, TREI suggests that its Answer to Hillcrest's Complaint can serve as timely notice of its dissatisfaction will Hillcrest's performance and thereby excuse it from performing under the Agreement and Amendments.  However, TREI provides no legal authority to demonstrate that an actual closing date, as defined here, would continue beyond the potential life of a contract.   Moreover, as mentioned above, TREI long ignored the fact that Hillcrest had not provided all the Due Diligence Materials, deciding instead to

repeatedly attempt to close the deal and further obligate itself, amendment after amendment.

As such, TREI has waived any protections that section 3(d) might have offered. *See BOB Acres, LLC v. Schumacher Farms, LLC*, 797 N.W.2d 723, 727–28 (Minn. Ct. App. 2011) ("Ignoring a provision in a contract will constitute waiver if the party whom the provision favors continues to exercise his contract rights knowing that the condition is not met."). Additionally, even though the Agreement stated that a waiver of dissatisfaction needed to be in writing, TREI's behavior in continually and knowingly ignoring any due diligence shortcomings by Hillcrest is sufficient to constitute waiver absent a writing. *Id.* at 728; *see also* 13 Williston on Contracts § 39:17 ("[T]here is no rigid requirement that the waiver of conditions be expressly made, either orally or in writing, since conditions may be waived either expressly or impliedly, and by acts or other conduct, by the party in whose favor they are made.").

Finally, the record demonstrates that TREI was satisfied with Hillcrest's performance.  No comments concerning a failure to provide documents like occupancy certificates were made.  Nor was any dissatisfaction communicated regarding the substitute survey and title insurance documents.  Instead, the parties worked together to supplement and correct information on their way towards closing the deal.  And nothing in the record suggests that TREI ever considered backing out of the deal because of Hillcrest's level of performance; in fact, TREI was willing to forego having some documents

in hand at closing, while thanking everyone for their work to close the deal.  Furthermore, even after the deal under the Agreement collapsed, TREI then agreed to enter into a contract for deed, and still said nothing about Hillcrest's due diligence performance.

In sum, TREI cannot claim that its obligations were excused pursuant to the Actual Closing Date conditions precedent.  As such, the Court finds that there remain no genuine issues of material fact that (1) TREI failed to provide written notice concerning Hillcrest's due diligence default or its dissatisfaction with Hillcrest's due diligence performance; (2) TREI continued to act as if the contract was binding and to perform even though Hillcrest failed to provide all such materials up until the deal ultimately collapsed; and, (3) TREI was satisfied all the while with Hillcrest's performance, at least until it asserted otherwise in its Answer.  Accordingly, the Court concludes that, as a matter of law, the second element of Hillcrest's breach of contract claim is met, concerning conditions precedent, because TREI is barred from challenging Hillcrest's right to demand performance notwithstanding its failure to provide all the Due Diligence Materials.

B.     Formation of an Enforceable Contract

It is undisputed that the Agreement was an enforceable contract up until and through the Second Amendment.  After that, however, Defendants argue that the Agreement terminated pursuant to the Second Amendment's Failure to Close provision, which specified that neither TREI nor Hillcrest would have any further obligations under the Agreement if they failed to close on January 22, 2020, which they did.  Defendants

further assert that the Third Amendment must be considered a new contract; but, as no

new consideration was offered when the parties entered into it, the Third Amendment is

unenforceable.[10]  Hillcrest counters that the parties waived the Failure to Close provision

by continuing to act as if the Agreement were binding; or, in the alternative, that the Third

Amendment was a new contract with consideration, as an exchange of mutual promises—

to buy and sell the property, respectively—is sufficient.

A contract or a term of a contract may be revoked by mutual agreement.  *Lucas v.

Am. Fam. Mut. Ins. Co.*, 403 N.W.2d 646, 648 (Minn. 1987).  The fact that the parties

renegotiated the terms of the initial Agreement shortly after January 22, and then

entered into the Third Amendment to reassume the obligations set forth in the

Agreement implies that they mutually agreed to revoke the Second Amendment's Failure

to Close provision.  Although the record is largely silent as to whether the parties explicitly

agreed to revoke this provision, it clearly shows that the parties behaved as if they were

still bound by the original contract, as they agreed to further amend the Agreement even

though both parties could have walked away free and clear at this time.

As such, the record demonstrates that the parties mutually waived the Failure to

Close provision.  *Fischer v. Pinske*, 243 N.W.2d 733, 735 (Minn. 1976) (per curiam) (holding

that parties can waive the effect of a contract provision when continuing to behave as if

---

[10] Additionally, as obligations under the Note would only arise if the Third Amendment were enforceable, Defendants claims that Olswang and Thomas are not liable either.

bound by the original contract); *see also Tynan v. KSTP, Inc.,* 77 N.W.2d 200, 209 (Minn. 1956) (explaining that where two contracting parties mutually assent to continue the contractual relationship after the contract has expired, the contract is considered to have continued in effect). Thus, the Third Amendment was simply an extension of the Agreement, which required no new consideration to be enforceable, as the Agreement was still executory[11] and neither party was in breach.[12] *Mitchell v. Rende,* 30 N.W.2d 27, 30 (Minn. 1947).

Alternatively, assuming that the parties had not waived the Failure to Close provision, the Third Amendment is an enforceable contract on its own. "[I]t is long-settled contract law that a promise is a sufficient consideration for a return promise." *BOB Acres*, 797 N.W.2d at 726 (citation omitted); *see also Baehr v. Penn-O-Tex Oil Corp.*, 104 N.W.2d 661, 665 (Minn. 1960) ("Consideration requires that a contractual promise be the product of a bargain. However, in this usage, 'bargain' does not mean an exchange of things of equivalent, or any, value. It is a negotiation resulting in the voluntary assumption of an obligation by one party upon condition of an act or forbearance by the other."). The parties' exchange of promises when entering into the Third Amendment—to convey the

---

[11] An executory contract is one "yet to be completed." *See* Executory, *Black's Law Dictionary* (11th ed.). Here, the property still had to change hands.

[12] Regarding any assertion that either party was in breach, neither took the necessary remedial steps defined in section 12 of the Agreement, preferring instead to continue forward with the deal. Moreover, as discussed above, TREI is barred from claiming that Hillcrest breached the Agreement in regard to Due Diligence Materials.

property in exchange for the purchase price—involved an assumption of an obligation upon condition of an act by another, and therefore constituted adequate consideration.

TREI tries to get around this hurdle by stating that the parties' exchange of promises constituted past consideration, as they simply mirrored promises made before. But this assertion is wholly without merit. Past consideration arises when a promise is made only after something has already been given. *See generally* Restatement (Second) of Contracts § 86 (1981)*; 4 Williston on Contracts § 8:11 (4th ed.); *see also State v. Schouweiler*, 887 N.W.2d 22, 25 (Minn. 2016) ("[W]hen the act or forbearance was given *before* the return promise was made, the act or forbearance is called 'past consideration.'"). Here, however, neither party had given anything before a return promise had been made. Instead, the parties once again exchanged mutual promises when signing the Third Amendment, offering again to buy and sell the property, which they had to do if, in fact, the Agreement had expired under the terms of the Second Amendment. Simply because TREI promised to pay the same purchase price as it had promised before is irrelevant. Parties are not precluded from asserting an identical promise to revive a deal since terminated; they are simply taking on an act or forbearance anew in doing so.

In sum, the Court finds that there remain no genuine issues of material fact concerning whether the parties were bound by an enforceable contract. Thus, the Court

concludes that, as a matter of law, the first element of Hillcrest's breach of contract claim is met, concerning the formation of an enforceable contract.

This leaves only the third element to consider: whether TREI breached the contract. It is undisputed that: TREI failed to close by March 13, 2020, Hillcrest provided written notice of this default, and the default was not cured within ten days. The Court therefore concludes that, as a matter of law, TREI breached the contract. Additionally, the Court concludes that Olswang and Thomas also are in breach, as it is indisputable that Hillcrest demanded payment pursuant to the Note after TREI's breach and that neither individual has paid the $250,000 owed. Accordingly, the Court will grant Hillcrest's Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

### C.    Specific Performance

The Third Amendment provides that Hillcrest is entitled to specific performance if TREI is in breach. "If real property is involved, specific performance is a proper remedy, even if the other remedies would be adequate." *Schumacher v. Ihrke*, 469 N.W.2d 329, 335 (Minn. Ct. App. 1991) (citing *Shaughnessy v. Eidsmo,* 23 N.W.2d 362, 368 (Minn. 1946)). "[B]ecause there is no open market for land either for seller or buyer, the number of instances where the buyer could get land substantially as satisfactory or where the vendor could make a ready sale to another purchaser is so small as to be negligible[,]" so the inadequacy of damages is presumed. *Shaughnessy*, 23 N.W.2d 362 at 368 (quotation

omitted).    However,  "a  court  will  not  order  a  performance  that  is  impossible."

Restatement (Second) of Contracts § 357 cmt. c (1981).

The parties dispute whether specific performance is justified based on the five

factors that courts consider when determining this question.[13]  However, the Court finds

that it need not analyze the five factors at this juncture.  Because the record demonstrates

that TREI was never able to secure the financing to complete the purchase, an order of

specific performance could very likely be impossible.  More information is needed to

determine whether specific performance is possible, for the parties did not address TREI's

ability to perform in their briefs, nor were they prepared to discuss it at oral argument.

As such, the Court will order additional briefing to address what remedy the Court should

now extend.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 27] is **DENIED**;

2. Plaintiff's Motion for Summary Judgment [Docket No. 46] is **GRANTED**; and

---

[13] Courts consider whether there is clear and convincing evidence of a contract, made for adequate consideration, and induced without misrepresentation or mistake; its enforcement will not cause unreasonable or disproportionate hardship or loss; and it was performed in such a manner that the beneficiary cannot be properly compensated in damages.  *Saliterman v. Bigos*, 352 N.W.2d 494, 496 (Minn. Ct. App. 1984) (quoting *Johnson v. Johnson,* 137 N.W.2d 840, 847 (Minn. 1965)).

3.  The parties are directed to file briefs addressing an appropriate remedy in regard to TREI's breach of the Agreement and Amendments.  Simultaneous briefs are to be filed within 30 days after entry of this Order.


DATED:  August 25, 2021
at Minneapolis, Minnesota.
                                                  JOHN R. TUNHEIM
                                                  Chief Judge
                                        United States District Court